## ZURICH GENERAL ACCIDENT AND LIABILITY INSURANCE CO., LTD., Plaintiff, v. LIBERMAN et, Defendants.

. Court of Common Pleas, Summit County.

No. 151103—Decided January 15, 1947.

James Olds, Akron, and H. A. Waltz, Akron, for plaintiff.
Robert Guinther and Samuel Freedman, Akron, for defendants.

## OPINION

By EMMONS, J.

This cause came on to be heard upon an agreed statement of facts, which is as follows:

"The plaintiff and the defendants stipulate and agree that the following are facts which may be considered by the Court together with any other evidence admitted by the Court:

"1. On or about the 18th day of January, 1944, the defendants made an agreement in writing with Anthony P. Miller, Inc., and Anthony P. Miller, for providing all material and appliances and performing all labor, services, etc., required to complete the work called for under 'Roofing and Sheet Metal', and all work related thereto, shown or specified in connection with the construction and completion of War Housing Project

OH33279, Akron, Ohio. A copy of the agreement in writing is attached hereto, marked 'Exhibit A.' (Hereinafter Anthony P. Miller, Inc., and Anthony P. Miller described in said contract will be spoken of as 'Miller'.)

"2. The War Housing Project described in said Exhibit A was a project for construction and completion of One Hundred Nineteen (119) separate structures or buildings.

"Miller performed, or caused to be performed, all the work necessary to be done to complete such structures or buildings.

"The only work with respect to such structures or buildings which was to be and was performed by the defendants was the work of applying roofing material on said buildings and structures after they had been constructed and prepared— ready for roofing—by Miller.

"The defendant entered upon and completed the work relating to roofing provided for in the contract identified as Exhibit A.

"3. As a part of each building or structure, Miller constructed canopies or hoods over the doorways in such building. The canopies or hoods were fastened to the building or structure by Miller. The defendants placed roofing on such canopies or hoods only after they had been constructed and put in place by Miller.

"Exhibits 'B' and 'C' attached hereto are photographs of a typical structure or building and the hoods or canopies constructed as part of the building.

"4. The hoods or canopies were constructed and attached by Miller after the work of construction of the building proper had been performed. The work of applying roofing materials on such hoods or canopies likewise was not performed as a part of or in connection with application or roofing materials to the main structure but was performed when the canopies or hoods were attached to the main structure by Miller.

"5. At the trial hereinafter mentioned, testimony was given that employees and foremen of Miller gave information to foremen and employees of the defendants when the canopies or hoods had been attached and were in condition for applying roofing material. Testimony further was given that such employees and foremen of Miller made statements to the employees and foremen of the defendants that the hoods and canopies were in condition and attached to the building in such fashion that the employees of the defendants might safely go upon them to perform their work of applying roofing materials to them.

"The work of applying roofing upon hoods or canopies had been performed by the defendants on approximately eighty (80) canopies or hoods before work was done on the canopy

or hood which, as described hereinafter, collapsed, causing injuries to one of defendants' employees.

"6. Miller attached the hoods or canopies to the buildings and caused them temporarily to be partially supported by wooden braces which were supplied and installed by Miller. As to one of said hoods or canopies a wooden brace supplied by Miller (being a piece of sheeting board about 7/8" thick, 4" wide and 4' long) was defective by reason of the existence in it of knots and knot-holes located somewhere about the middle of the piece of sheeting board.

"7. At the trial hereinafter mentioned testimony was given that employees and foremen of Miller gave information to employees and foremen of the defendants, including one Lewis D. Hoover, that the hood or canopy attached and supported as described in paragraph '6' foregoing was in condition for application of roofing material thereon.

"8. Said Lewis D. Hoover, as employee of the defendants, went upon such hood or canopy on the 19th day of June, 1944, to perform the work of applying roofing to it. While he was upon the hood or canopy, the supporting brace described in paragraph '6' broke: the hood or canopy collapsed: and Hoover fell to the ground and sustained personal injuries.

"9. On July 10, 1944, said Hoover began an action against Miller in the Court of Common Pleas of Summit County, Ohio, by filing a petition in Cause Number 147139 upon the docket of said Court. Therein he prayed for damages in the amount of $10,000 for his injuries. The petition, copy of which is attached as 'Exhibit D', makes allegations that such injuries resulted from the negligence of Miller. It makes no allegations or claims that the injuries resulted from any negligence on the part of the defendants. Miller filed an answer to the petition of the plaintiff denying the allegations of negligence made as against Miller and alleging that Hoover was himself negligent, which negligence directly and proximately contributed to the injuries which he sustained. The answer is attached hereto as an exhibit, marked 'Exhibit E'.

"10. On November 3, 1943, the plaintiff herein had issued a policy of public liability insurance to Miller which was in full force and effect on June 19, 1944, pursuant to the terms whereof the plaintiff was required to and did undertake the defense of the suit of Hoover v. Miller. The answer (Exhibit E) was prepared and filed on behalf of Miller by counsel employed by the plaintiff and the defense of such action was maintained by counsel employed by the plaintiff.

"11. On October 18, 1944, such counsel employed by the plaintiff notified the defendants in writing that Hoover's petition had been filed and requested that defendants assume the

defense of the suit then pending of Hoover v. Miller. Certain claims to be asserted against the defendants were set forth in the notice in writing, copy of which is attached hereto as 'Exhibit F.'

"12. Responding to the notice 'Exhibit F', the defendants, on Oct. 25, 1944, through their counsel, informed counsel employed by the plaintiff that they would not undertake the defense of the action.

"13. The action came on for trial on November 1, 1944. The plaintiff, Lewis, D. Hoover, and various witnesses, testified in support of the allegations of the petition and various witnesses testified in support of the allegations of the answer. No testimony was given claiming or tending to claim that the defendants had been negligent in the performance of the work described in the contract between Miller and the defendants.

"14. The trial of the cause continued. It was argued to the jury. While the jury was engaged in deliberation, after being charged by the court, the plaintiff (on behalf of Miller) paid Lewis D. Hoover $3500 and the accrued court costs of $32.47 in compromise and settlement of his claim. The pending suit against Miller was thereupon dismissed.

"15. Information was given to counsel for the defendants that settlement was contemplated upon the terms set forth foregoing and information was further given when the settlement had been consummated.

"16. In the investigation of the claim of Hoover v. Miller and preparation and trial of the action against Miller up to the point of settlement, the plaintiff incurred and paid obligations for medical services and expert testimony in the amount of $65.00: for stenographic services in the amount of $18.00: and for attorney's fees to counsel selected by the plaintiff in the amount of $420.36.

"17. The contract or policy of public liability insurance issued by the plaintiff to Miller (and referred to in paragraph '10') contained a provision as follows:

" 'Subrogation: In the event of any payment under this policy, the company shall be subrogated to all the insured's right of recovery therefor, and the insured shall execute all papers required and shall do everything that may be necessary to secure such rights.'

"Demands have been made upon the defendants by the plaintiff pursuant to such provision for subrogation, for reimbursement of the amounts paid out and expended by it. The defendants have refused to reimburse the plaintiff.

"18. The defendants have complied with all the provisions of the law of Ohio commonly known as Workmens

Compensation Law and had paid the premiums required to be paid to the Industrial Commission of Ohio. The said Hoover made application for and received payments from the Industrial Commission and the defendants executed such papers, instruments and reports as were sought by the Industrial Commission of Ohio and required to be filed with it. The Industrial Commission of Ohio paid to Hoover the sum of $373.00 pursuant to his application and in addition paid hospital and medical expenses of said Hoover in the amount of $88.00."

For the purposes of brevity the Court will refer to Anthony P. Miller, Inc., as Miller.

The contract herein referred to was prepared by Miller and, therefore, it is to be more strictly construed against him, or, in other words, if the contract is reasonably susceptible of two interpretations, that interpretation which inures to this defendant's benefit should prevail.

In **Dingledy Lumber Co. et al v Erie Railroad Co., 102 Oh St 236,** Judge Matthias said:

"It is a fundamental rule in the construction of contracts of indemnity that such a contract shall not be construed to indemnify against the negligence of the indemnitee unless it is so expressed in clear and unequivocal terms."

In North American Railroad Construction Co. v. Cincinnati Traction Co., 172 Federal Reporter 214, the Court said:

"It would take clear language to show that a contract of indemnity was intended to cover conditions or operations under the control of the party indemnified and not under the control of the indemnifying party, such, for instance, as accidents, the proximate cause of which is the negligence of the party indemnified."

In Mitchell v. Southern Railway Co., 124 Kentucky, 146, the Court held:

"Such an interpretation should not be given a contract that would make the appellant responsible for the consequences of a negligent act of the appellee unless no other meaning can be ascribed to it. If a doubt existed as to its meaning the court would resolve that doubt against the contention that

the, contract was intended to indemnify the appellee against its own negligence. Every presumption is against such intention."

Thus for the plaintiff to recover in this cause, the intention of Miller and the defendants must be clear and insusceptible of any other interpretation, for while such a contract of indemnification is not strictly against public policy, it so nearly borders on the line, that a strict construction against the one to be indemnified for his own negligence is necessary.

The first part of the contract necessary to be construed is as follows, Article 13, sentence No. 1:

"The sub-contractor shall indemnify and save harmless the owner, architect, engineer and contractor against all claims for damages to persons or property growing out of the execution of this work."

By "this work" is meant the work which the sub-contractor, the defendants herein, agreed to perform, namely: the roofing of the several houses being built by Miller.

What is meant by the expression: "growing out of the execution of this work"?

"This work" definitely means putting on the roofing of these houses being built by Miller, and any damages recoverable must have grown out of his execution of this work, and it must not come from the execution of any other work.

It is true that Hoover, to execute the roofing for his employer, the defendants herein, had to go upon the canopies of these houses. But what was the cause of his injuries? Did they grow out of the execution of roofing or grow out of the execution of the work of building the canopies?

It was stipulated that this particular canopy was defective by reason of the existence in it of knots and knotholes located somewhere about the middle of the piece of sheeting board, and that Hoover on June the 19, 1944, went upon this canopy to apply the roof, and while on it the supporting brace, referred to above, broke, causing Hoover to fall to the ground and injuring him.

Neither Hoover nor his employer had anything to do with the construction of the canopy, nor did its construction grow out of the execution of their work of roofing. It is obvious to this Court that the intention of the parties, insofar as the first sentence of Article 13 of said contract is concerned, is that under such circumstances the defendants would not be

liable to Miller nor to the plaintiff herein who has acquired his rights through subrogation.

The Court will pass to the consideration of the third sentence in Article 13 before discussing sentence. No. 2, because of the similarity of the first and third sentences.

The third sentence in such contract is as follows:

"The sub-contractor does hereby agree to indemnify and save harmless the contractor, owner, architect and engineer of and from all loss, damage, cost and expense which the contractor may suffer or sustain or be threatened with liability for, arising, either under any workmen's compensation law or otherwise, out of the performance of this contract by the sub-contractor, his agents, employees or materialmen."

What does "arising out of the performance of the contract" mean?

It is admitted by counsel for plaintiff, insofar as this case is concerned, there is no substantial difference between the first and third sentences of Article 13 in this contract, and with that view the Court agrees.

The actual injury must have arisen directly and proximately from the execution and performance of the actual work incident to roofing the canopies. As in the consideration of the first sentence of Article 13 of the contract, there is nothing further stated in the third sentence that would give Miller the right to recover against the defendant for Hoover's injuries, and since the plaintiff, by subrogation, stands in Miller's place, he possesses no greater rights than Miller, so that, insofar as the first and third sentences of Article 13 of the contract are concerned, the plaintiff cannot recover.

Coming now to the consideration of sentence two of Article 13 of the said contract, which is as follows:

"If at any time during the construction of the work covered by this contract, the sub-contractor, his agents or employees, should, either with or without the permission of the contractor, use any tools, appliances, material or machinery which belong to or are furnished by the contractor, the sub-contractor does hereby assume full responsibility for any injury to person or property which may result from or in connection with the use of any such tools, appliances, materials or machinery by the sub-contractor, his agents or employees, whether such injury is due to the negligence of an employee of the contractor, or otherwise."

This section makes the sub-contractor liable generally only if his employees are using tools, appliances, materials or machinery which belong to or are furnished by the contractor, so that if such a situation exists the liability is extended on the sub-contractor's part, whereas, in the first and third sentences his liability is established only if the injuries grew out of the execution or the performance of roofing work.

As was ably put by counsel for the defendant, the fact that Hoover was on the canopy to execute his job of roofing was not the proximate cause of his injury, but rather the remote one. The proximate cause was the defective lumber used by Miller in executing his work in building the canopy.

It is the contention of the plaintiff that the canopy was an appliance, for after the building was constructed the canopy was built and attached thereto by Miller.

Counsel for plaintiff does not claim this canopy as being a tool, material or machinery under the contract, but does claim it is an appliance.

What is an appliance?

77 Southern page 65. Holland-Blow Stove Co. v. Spencer, the Court held:

"A scaffold is not an appliance or utility within the meaning of the law imposing on the master the duty to exercise reasonable care in furnishing reasonably safe appliances."

197 Southwestern 944, McFarland v. Chesapeake & Ohio R. R. Co it was held:

"A station water tank, rope or scaffold used thereon by a painter are not appliances within the meaning of the Federal Employers Liability Act."

64 Oklahoma 229, Western Tie & Timber Co. v. Pulliam, it was held that:

"Defective materials furnished by the master to be used in the prosecution of the work, such as boards with nails in them, are neither tools nor appliances."

The canopy, even though constructed after the house was built, in this instance became a part of the building upon being annexed thereto. This canopy became the roof to protect the front steps and was an integral part of the house in its entirety.

The use of the word "appliances" along with the words "tools, materials and machinery" indicates an intention of the parties to treat an "appliance" as something that was used in the construction of the houses, and they did not intend it to mean either a temporary or permanent part of the construction.

The Court therefore finds that such was not an appliance under the terms of the contract and that to say otherwise would be inconsistent with good reasoning.

Even though the Court had found the same to have been an appliance, it was admitted in the Agreed Statement of Facts that one of the braces was defective, and defective material used to prepare a safe place to work is not an appliance.

Assuming further, for purposes of argument, that this had been an appliance, it would have had to have been used by Hoover. "To use" is defined in this sense as "to do work with"; it does not mean to do work upon. It denotes an active use to further a purpose. One could not say that Hoover was using this canopy. That construction would be lending added intention to the contract when such intention did not exist, resolving it more favorably to the plaintiff than to the defendant, which cannot be done in this instance.

The Court finds that under the terms of the contract the plaintiff cannot recover from the defendant, and since such has been the construction of this contract the Court finds that it is unnecessary to pass upon the other points herein involved.

Journal entry to be prepared to conform to the Court's findings, saving exceptions to this plaintiff.